**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

```
_____
                               )
Michael Devine,                )
                               )
          Plaintiff,           )
                               )         Civil Action
v.                             )         No. 21-cv-11230-PBS
                               )
Town of Hull,                  )
Town of Hull School Committee, )
David Twombly,                 )
Stephanie Peters,              )
Jennifer Fleming,              )
Lucas Patenaude, and           )
Eric Hipp,                     )
each in their capacity as      )
members of the Town of Hull    )
School Committee,              )
                               )
          Defendants.          )
_____)
```

**MEMORANDUM AND ORDER**

January 17, 2024

Saris, D.J.

**INTRODUCTION**

This case arises out of the decision to terminate the Town of Hull Superintendent of Public Schools based on communications he had with a 21-year-old, former student three years after the student had graduated. Michael Devine filed a complaint against the School Committee alleging violation of the First Amendment (Count I), Breach of Contract (Count II), Defamation (Count III), Intentional Infliction of Emotional Distress (Count IV), Negligent

Infliction of Emotional Distress (Count V), Breach of the Covenant of Good Faith and Fair Dealing (Count VI), Discrimination (Count VII), and Interference with Advantageous Economic Relations (Count VIII). Defendants moved for summary judgment, and the Court held a hearing on the motion. For the reasons that follow, the motion is **ALLOWED IN PART** and **DENIED IN PART**.

## I.   BACKGROUND

When all reasonable inferences are drawn in favor of the non-moving party, the following facts are undisputed except where stated.

### A.   Parties

Plaintiff, Michael Devine, was Superintendent of Hull Public Schools from August 2, 2017, to April 29, 2020.

Defendants are the Town of Hull, Town of Hull School Committee, and Town of Hull School Committee Members David Twombly, Stephanie Peters, Jennifer Fleming, Lucas Patenaude, and Eric Hipp, each in their capacity as members of the Town of Hull School Committee.

### B.   Factual Background

From July 2009 to August 1, 2017, Devine was employed as the Principal of Hull High School. On August 2, 2017, Devine was appointed Superintendent of the Hull Public Schools. Devine's contract was subsequently extended.

While Devine was still serving as Principal, he made the acquaintance of a high school student, Ryan Hauter. Due to an unstable family life and other personal challenges, Hauter needed additional support and was assigned to work with Hull High School's Student Assistant Team. As part of the program, he was assigned an internship in Devine's office, a position that existed before and after Hauter held the role. Devine never spoke to Hauter outside of school hours while he was a student, nor did he act inappropriately toward him during that time.

Andrea Centerrino, the school Social Worker, was another mentor to Hauter. Centerrino shared her personal cell phone number with Hauter, and they remained in close contact during high school and have done so ever since.

After Hauter graduated from Hull High School in 2017 and Devine was appointed Superintendent, Hauter and Devine met twice in person, both times in Devine's office. At one of those meetings, Hauter was visibly shaken and teary, and, concerned for his mental health, Devine gave him his personal cell phone number.

At some point Devine learned that Hauter had moved to Florida. Devine and Hauter started exchanging text messages in 2019. While Hauter was living in Florida, Devine learned from Centerrino that Hauter had tried to commit suicide. After receiving treatment for his suicide attempt, Hauter reached out to Devine. They had various

conversations by text. Devine mentioned his boyfriend to Hauter which was the first time Devine had referenced being gay.

In September 2019, Hauter sent a text message to Devine saying "I love you" followed by two emojiis. Dkt. 38-2 at 17. The next evening, Hauter and Devine exchanged the following text messages:[1]

Hauter:   Point is, you can't make me uncomfortable

Devine:   You don't think?

Hauter:   Highly unlikely

Devine:   Really?

Hauter:   Yeah

Devine:   So...,
          Have you thought about us in a different way?

Hauter:   I haven't, I'm sorry that doesn't change anything tho

Devine:   Ok. Glad that is out of the way!!!

. . .

Devine:   Awkwardness and uncertainty over!!
          And why you laugh so hard?
          [smiling crying emoji]

Hauter:   It was a shock hahaha

Devine:   What was?
          Just kidding!

Hauter:   Hahahah my thinking was "my former principal just came on to me" hahahaha

Devine:   No he didn't!

---

[1] These text exchanges were saved as screenshots from Hauter's cell phone. The full conversations were deleted, so there is no indication of what time or day they were sent and received or what preceded and followed them in the exchange.

|           | Well...                                                            |
|-----------|-------------------------------------------------------------------|
| Hauter:   | It's okay                                                         |

. . .

| Devine:  | You totally knew what I was hinting at didn't you? |
| Hauter:  | Yes |
| Devine:  | Thought so.<br>But you had to let me put it out there , huh? |
| Hauter:  | I didn't say anything, I honestly wasn't expecting it hahahah |
| Devine:  | You wondered though didn't you? [smiley emoji] |
| Hauther: | I had no thought of it to be completely honest [smiling crying emoji] |
| Devine:  | That's because you don't realize what an amazzing person you are. |

. . .

| Devine:  | Awesome. Psyched to hear that!!!<br>Never want u to be uncomfortable<br>You have had enough of that in your life so just want everything to be clear. |
| Hauter:  | Absolutely |
| Devine:  | Good.<br><br>So you have now seen my vulnerable side. |
| Hauter:  | You've seen mine so we're even now |
| Devine:  | But mine is really bad. So pissed at myself. Sorry. |

. . .

| Devine:  | So I'll never bring this conversation up again and when I see u when u get up here it will be like this never took place. |
| Hauter:  | Don't sweat it at all seriously don't. let's just put it behind us |

```
Devine:    Yup!! Never happened ! Although I do have to tell
           u one thing ...
           And it will be weird but do u want to hear it?

Hauter:    No I'm sorry

Devine:    That's all good!
           You have no reason to
           [unintelligible]

. . .

Hauter:    It's okay

Devine:    No it's not.

Hauter:    How so

Devine:    Crossed the line.

Hauter:    It's seriously okay
           We're two adults
           I'm still talking to you

Devine:    True but shouldn't have gone there.

Hauter:    Don't sweat it at all. I'm not worrying about it

Devine:    Ok. Thanks. Now I know.
           Wondered but now I know.
```

Dkt. 38-8.

On September 18, 2019, sometime after these exchanges took place, Hauter contacted Centerrino and told her that Devine had sent him sexual messages that confused and upset him. Centerrino contacted Nicole Nosek, the Principal of Hull High School at the time, explaining that she was concerned about communications between a faculty member and former student which were making the former student very upset. Nosek asked Centerrino to meet with Devine, which she then did. At that meeting, Devine admitted that

he had crossed the line. Neither Centerrino nor Nosek reported the incident to the School Committee.

In January 2020, Hauter sent the following messages to Devine:

Hauter:   I'm so fucking mad at you. You literally ruined our relationship. I looked up to you. You were my best friend. I spoke so highly of you and defended your name. Why would you ever think it would go by unnoticed to ask me what you asked me. How could you possibly think that things would be the same after that. The lack of restraint and the lack of judgment on your end is appalling. And it also leaves me wondering, when did you start thinking that way about me? When I was 17?
[unintelligible]
. . .
You were the person I came to when I needed to cry about my fucked up life. And I came to respect you so highly for caring so much and helping me get through those bad days and now you've led me to believe that you took advantage of my vulnerability. I told you I was suicidal. I told you I tried to kill myself. I told you I was going through a break up after 4 years. And instead of just fucking being there for me you come on to me? What the fuck even is that? You've hurt me more than you will ever know. Live with that.

Dkt. 38-9. Hauter subsequently sent Devine a message saying, in essence, resign or he (Hauter) would go public.

On January 20, 2020, Hauter reached out to School Committee Member Jennifer Fleming via Facebook and told her about his exchange with Devine. On January 27, 2020, Devine was called to a meeting with School Counsel Michael Maccaro, Fleming, and Chair of the School Committee David Twombly to discuss the text exchange. Devine was advised to retain counsel and take the next few days off.

On January 29, 2020, the School Committee held a meeting in executive session which Devine attended accompanied by counsel. Devine apologized for creating the situation. At some point, School Committee Member Lucas Patenaude asked Devine directly if he was gay. Devine responded in the affirmative. Devine noted that he thought if his texts with Hauter were between a man and a woman it would have been treated differently. Patenaude then told Devine something to the effect of "you're giving the gay cause a bad name." Dkt. 38-2 at 41. The notes from the executive session indicate that "Mr. Devine demonstrated predatory and grooming behavior." Dkt. 38-15 at 14. At that session, Devine through counsel, offered to tender his resignation.

Several days later, the School Committee learned that there may have been another allegation about Devine's conduct from another former student. Devine was placed on paid administrative leave. On February 3 and 5, the School Committee issued separate press releases indicating that Devine was being investigated for allegations of personal misconduct and that the Hull Police Department had been notified. See Dkts. 38-20, 38-23.

During that time, the School Committee retained Guilfoil Public Relations LLC ("Guilfoil"), who already had a contract with the School District on unrelated matters, to investigate the allegations against Devine. Guilfoil hired retired Arlington

Police Chief Frederick Ryan and retired Massachusetts State Police Captain Greg Foley to conduct the investigation.

On February 5, the School Committee received a written narrative from a young man and former student of Norwell High School that contained similar allegations to those of Hauter. He confirmed these allegations in a phone call to Foley. The former student, Timothy J. Dalferro, alleged that Devine had been a mentor to him while Devine was an administrator and teacher at Norwell High School and the young man was a student. After the young man had graduated and had turned 21, Devine made sexual advances toward him. The young man was extremely hurt and upset and felt betrayed by Devine's changed attitude toward him. A website called Turtleboy reported a third alleged victim who was not identified and did not offer verifiable information.

At the end of March 2020, the School Committee convened an executive session to discuss the result of the investigation into Devine's conduct. Investigator Foley summarized his findings and concluded that Devine's behavior toward Hauter was unethical, that he had "groomed" Hauter while he was a student, and that his behavior violated the School's sexual harassment policy.[2]

---

[2] It is worth noting that the only record of the interviews referenced in the investigative report are Foley's summaries contained therein. Although Foley apparently recorded the interviews on his phone, he later deleted them. The witnesses were not presented with the summaries of their statements or given the opportunity to confirm or modify them. There is no evidence that

Two weeks later, Devine received a notice of intent to terminate his employment in accordance with his employment agreement, with the investigator's report attached. On April 28, 2020, the School Committee held an executive session. Devine was represented by counsel and had the opportunity to speak. The School Committee voted 5-0 to terminate Devine's employment as Superintendent of Hull Public Schools for cause effective April 29, 2020. Since then, Devine has been unable to secure employment in his field despite efforts to do so.

## II.  LEGAL STANDARD

Summary judgment is appropriate when, based upon the pleadings, affidavits, and depositions, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.

Generally, "a party seeking summary judgment always bears the initial responsibility of informing the district court of the basis

---

the summaries were inaccurate; however, it is far from best practice to conduct an investigation without ensuring some means for its review.

for its motion." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). "To succeed, the moving party must show that there is an absence of evidence to support the nonmoving party's position." Rogers v. Fair, 902 F.2d 140, 143 (1st Cir. 1990). Once it has made the requisite showing, the burden shifts to the nonmovant to "present definite, competent evidence to rebut the motion" and demonstrate that a "trialworthy issue persists." Vineberg v. Bissonnette, 548 F.3d 50, 56 (1st Cir. 2008) (internal citations and quotations omitted). "'[T]he mere existence of a scintilla of evidence' is insufficient to defeat a properly supported motion for summary judgment." Torres v. E.I. Dupont De Nemours & Co., 219 F.3d 13, 18 (1st Cir. 2000) (quoting Anderson, 477 U.S. at 252).

## III. DISCUSSION

### A.   Civil Rights Claims (Count I)

#### 1.   First Amendment – Freedom of Speech

Devine claims that his text exchanges with Hauter were protected by the First Amendment and Defendants wrongfully retaliated against him.

"To prevail on a speech-retaliation claim as a public employee, a plaintiff must prove that (1) []he 'spoke as a citizen on a matter of public concern,' (2) [his] employer lacked 'an adequate justification for treating [him] differently from any other member of the general public,' and (3) [his] 'protected expression was a substantial or motivating factor in the adverse

employment decision.'" Salmon v. Lang, 57 F.4th 296, 308 (1st Cir. 2022) (quoting Bruce v. Worcester Reg'l Transit Auth., 34 F.4th 129, 135 (1st Cir. 2022)).

Accordingly, the Court must first decide whether the litigation at issue can be "fairly characterized as constituting speech on a matter of public concern." Connick v. Myers, 461 U.S. 138, 146 (1983). "Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record." Id. at 147-48. Once plaintiff has demonstrated that he has engaged in speech implicating matters of public concern, the government's "burden in justifying a particular discharge varies depending upon the nature of the employee's expression." Id. at 150. "When close working relationships are essential to fulfilling public responsibilities, a wide degree of deference to the employer's judgment is appropriate." Id. at 151-52. However, "a stronger showing may be necessary if the employee's speech more substantially involved matters of public concern." Id. at 152. If "the employee's and the public's First Amendment interests outweigh a legitimate governmental interest in curbing the employee's speech, [the employee] must show that the protected expression was a substantial or motivating factor in an adverse employment action." Tang v. Rhode Island Dep't of Elderly Affs.,

163 F.3d 7, 12 (1st Cir. 1998) (citing O'Connor v. Steeves, 994 F.2d 905, 913 (1st Cir. 1993)).

Here, Devine's speech is not protected. Devine's texts with Hauter discussed the metes and bounds of a personal relationship via private text message. Thus, the speech does not implicate a "matter of public concern." As Devine's speech was not protected by the First Amendment, his retaliation claim must fail.

2.   First Amendment – Freedom of Association

Devine next contends that his freedom of association has been violated by Defendants' intrusion into his personal relationship with Hauter. This is not so.

The Supreme Court has "long understood as implicit in the right to engage in activities protected by the First Amendment a corresponding right to associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends." Roberts v. United States Jaycees, 468 U.S. 609, 622 (1984) (citing cases). However, the Constitution only protects against state action "to the extent that the targeted association is characterizable in terms of some particular constitutional concern." See Correa-Martinez v. Arrillaga-Belendez, 903 F.2d 49, 57 (1st Cir. 1990), overruled on other grounds by Educadores Puertorriquenos en Accion v. Hernandez, 367 F.3d 61 (1st Cir. 2004) (collecting cases). A school

superintendent's personal relationship with a student is not a protected form of association.

### 3.  Procedural Due Process

Devine asserts that Defendants deprived him of due process of law because they decided to terminate him before giving him an opportunity to be heard.

The Due Process Clause of the Fourteenth Amendment provides that no state shall "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. Accordingly, "certain substantive rights -- life, liberty, and property -- cannot be deprived except pursuant to constitutionally adequate procedures." Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 541 (1985). "'[T]he root requirement' of the Due Process Clause" is that an individual must be provided notice and an opportunity to be heard prior to being "'deprived of any significant property interest.'" Id. at 542 (quoting Boddie v. Connecticut, 401 U.S. 371, 379 (1971)).

In evaluating a procedural due process claim under the Fourteenth Amendment, courts must determine "whether [the plaintiff] was deprived of a protected interest, and, if so, what process was his due." Logan v. Zimmerman Brush Co., 455 U.S. 422, 428 (1982). Accordingly, "[t]o establish a procedural due process violation, the plaintiff 'must identify a protected liberty or property interest and allege that the defendants, acting under

color of state law, deprived [him] of that interest without constitutionally adequate process.'" González-Droz v. González-Colón, 660 F.3d 1, 13 (1st Cir. 2011) (second alteration in original) (quoting Aponte-Torres v. Univ. of Puerto Rico, 445 F.3d 50, 56 (1st Cir. 2006)).

Here, the parties agree that Devine possessed a property interest in his employment by virtue of his employment agreement. Defendants submit that Devine was given notice of intent to terminate his employment and was provided with an opportunity for a meeting before the School Committee to present reasons why the Committee should not terminate his employment. Devine responds that (1) the executive session did not bear the hallmarks of a hearing and therefore was insufficient to meet the requirements of due process, and (2) the executive session was a sham, the Committee having already decided to terminate him.

A termination hearing "'need not be elaborate' as long as an employee receives (1) 'oral or written notice of the charges against him,' (2) 'an explanation of the employer's evidence,' and (3) 'an opportunity to present his side of the story.'" Chmielinski v. Massachusetts, 513 F.3d 309, 316 (1st Cir. 2008) (quoting Cleveland Bd., 470 U.S. at 545-46).

Devine contends that the April 28, 2020 Executive Session (the "Executive Session") did not qualify as a hearing under due process because he was not permitted to ask questions and because

it was repeatedly characterized at the time as "not a hearing." See Dkt. 43-24. In addition, in a letter dated April 24, 2020, Devine was informed that his counsel was permitted to "be present . . . during deliberations" and "to have counsel . . . present and attending for the purpose of advising [Plaintiff] [but] not for the purpose of active participation in the executive session." Dkt. 43-25 at 2. Therefore, Devine concludes, the Executive Session cannot be characterized as a hearing as was required by procedural due process.

Devine's arguments are misplaced. The Supreme Court has noted that a pretermination hearing "need not be elaborate" and in general, "'something less' than a full evidentiary hearing is sufficient prior to adverse administrative action." Cleveland Bd., 470 U.S. at 545 (quoting Mathews v. Eldridge, 424 U.S. 319, 343 (1976)). Here, Devine was presented with the evidence in support of his termination and was given the opportunity to respond. That is sufficient to meet the constitutional threshold.

Devine next contends that the entire Executive Session was a sham. Devine points to Executive Session Minutes from sessions earlier in the spring reflecting the Committee's willingness to proceed with termination as evidence that the Committee had already decided to terminate Devine prior to the April 28, 2020 Executive Session. This argument misses the mark in the employment context. "[E]mploying authorities may preside at termination hearings even

though they instituted the termination proceedings." <u>Lawless v.</u>
<u>Town of Freetown</u>, 63 F.4th 61, 68 (1st Cir. 2023); <u>see also</u> <u>Acosta-</u>
<u>Sepulveda v. Hernandez-Purcell</u>, 889 F.2d 9, 12 (1st Cir. 1989).
The hearing is a safeguard meant to determine "whether there are
reasonable grounds to believe that the charges against the employee
are true and support the proposed action." <u>Cleveland Bd.</u>, 470 U.S.
at 545-46.

Here, it is true that the Committee had already proposed
terminating Devine's employment agreement before the Executive
Session was held, but the final decision was not made until the
results of the investigation were presented and Devine had an
opportunity to be heard. As there is no other evidence that the
hearing was a pretext or that fundamental due process qualities
(like adequate notice) were not provided, Devine's argument is not
supportable.

Finally, Devine contends that Defendants withheld the
Administrative Review which contained the basis for the proposed
termination for nearly six weeks. However, the Review was produced
to Devine on April 13, 2020, two weeks before the Executive
Session. While it would have been better practice to produce the
Review when it was finalized, the delay did not violate Devine's
constitutional rights because he has not shown that he had
inadequate time to respond.

Accordingly, Defendants' motion for summary judgment as to Count I is **ALLOWED**.

B.   **Breach of Contract Claim (Count II); Breach of the Covenant of Good Faith and Fair Dealings (Count VI)**

Devine asserts that Defendants terminated his employment agreement without good cause. The employment agreement defines good cause as whenever the Committee has put forth "any grounds put forth by the Committee that are not arbitrary, irrational, unreasonable, in bad faith, or irrelevant to the sound operation of the school system." Dkt. 38-3 at 7.

Defendants argue that for the reasons outlined in the investigative report (the "Report"), there was good cause for terminating Devine. The Report was compiled by Guilfoil Public Relations which engaged former Arlington Police Chief Frederick Ryan and retired Massachusetts State Police Captain Greg Foley to investigate the allegations against Devine. The Report consisted of summaries of twelve interviews conducted by Foley, a policy review, Foley's conclusions, and several exhibits including school policies and screenshots of the text messages between Devine and Hauter. See Dkt. 38-26.

The Report concluded that Devine's text messages with Hauter were "inappropriate, unethical, unacceptable and opportunistic." Dkt. 38-26 at 34. The Report chronicled the detrimental effect that Devine's actions had on Hauter's well-being and revealed the

allegations of another former student in a different school district which mirrored those of Hauter's allegations.

The School Committee reviewed the Report and gave Devine the opportunity to review it and respond. Only then did the School Committee vote to terminate Devine's employment agreement. Defendants submit that termination on these grounds was not arbitrary, irrational, unreasonable, in bad faith, or irrelevant to the sound operation of the school system.

Devine responds that the entire investigation was permeated by bad faith, as reflected in his claims that it violated Due Process and his First Amendment rights, see supra,[3] and that it was infected with discriminatory animus, see infra. In addition, Devine argues that his conversation with Hauter was not relevant to his responsibilities as Superintendent and therefore could not be a basis for termination for cause.

"[T]he federal courts are not in the business of reviewing day-to-day administrative judgments." Tardif v. Quinn, 545 F.2d 761, 763-64 (1st Cir. 1976). A decision "is not arbitrary and capricious if 'reasonable minds could differ' on the proper outcome." Doe v. Superintendent of Schs. of Stoughton, 767 N.E.2d 1054, 1058 (Mass. 2002) (quoting Kinchla v. Bd. of Appeals of

---

[3] As the Court has already granted summary judgment for Defendants as to Devine's civil rights claims, they will not be discussed further.

Falmouth, 415 N.E.2d 882, 883 (Mass. App. Ct. 1981)). Bad faith termination requires a plaintiff to "show that defendant either (1) intended to benefit financially at plaintiff's expense; or (2) terminated plaintiff in violation of a clearly established public policy." Shen v. Biogen Idec Inc., 523 F. Supp. 2d 48, 54 (D. Mass. 2007). "In Massachusetts, all contracts contain an implied covenant of good faith and fair dealing which provides that each party involved will not 'do anything that will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.'" Cummings v. City of Newton, 298 F. Supp. 3d 279, 290 (D. Mass. 2018) (quoting K.G.M. Custom Homes, Inc. v. Prosky, 10 N.E.3d 117, 124 (Mass. 2014)).

Applying these standards, the Court finds that there remains a triable issue of fact as to whether Devine's personal conversations two years after a former student had left the high school and was living in a separate state were relevant to the sound operation of the school system. How and why Devine's behavior toward a former student impacted his ability to manage the Hull Public Schools is disputed. The Report concluded that Devine had exhibited "grooming behavior" while Superintendent, but that is a question of fact for the jury to decide. Moreover, as discussed below, it is a triable issue of fact whether and to what extent his termination was motivated by a discriminatory animus against gay people.

Furthermore, "[i]n Massachusetts, all contracts contain an implied covenant of good faith and fair dealing which provides that each party involved will not 'do anything that will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.'" Cummings v. City of Newton, 298 F. Supp. 3d 279, 290 (D. Mass. 2018) (quoting K.G.M. Custom Homes, Inc. v. Prosky, 468 Mass. 247, 254, 10 N.E.3d 117 (2014)). It will be up to a jury to decide whether Defendants acted in bad faith when they voted to terminate Devine.

Accordingly, Defendants' motion for summary judgment as to Counts II and VI is **DENIED**.

### C.   Defamation Claim (Count III)

Devine contends that Defendants defamed him when they informed the public that they were investigating his conduct and had notified the police department of the matter.

Under Massachusetts law, to prevail on a claim for defamation the plaintiff must establish that: (1) the Defendant published an oral (slander) or written (libel) statement; (2) the statement was about, and concerned, the plaintiff; (3) the statement was defamatory; (4) the statement was false; and (5) the plaintiff suffered economic loss, or the claim is actionable without proof of economic loss. Stanton v. Metro Corp., 438 F.3d 119, 124 (1st Cir. 2006). "The lodestar of Massachusetts defamation law is the

axiom that truth is an absolute defense to defamation." Noonan v. Staples, Inc., 707 F. Supp. 2d 85, 90 (D. Mass. 2010) (quoting Taylor v. Swartwout, 445 F. Supp. 2d 98, 102 (D. Mass. 2006)). Here, while releasing the information to the public may well have been mean-spirited, the record reflects that an investigation was ordered into Devine's conduct and the Hull Police Department was informed of the matter. Accordingly, Defendants' motion for summary judgment as to Count III is **ALLOWED**.

### D.   Common Law Claims (Counts IV, V, and VIII)

#### 1.   Intentional Infliction of Emotional Distress (Count IV)

The Massachusetts Tort Claims Act ("MTCA"), Mass. Gen. Laws ch. 258, "waives the governmental immunity that 'public employers' have against tort liability for the 'negligent or wrongful' conduct of their employees done 'while acting within the scope of [their] office or employment.'" FBT Everett Realty, LLC v. Massachusetts Gaming Comm'n, 187 N.E.3d 373, 389 (Mass. 2022) (citing Mass. Gen. Laws ch. 258, § 2). But while public employers "shall be liable . . . in the same manner and to the same extent as a private individual under like circumstances" for the negligence of their employees acting within the scope of their office or employment, id., the MTCA's immunity waiver does not extend to claims for intentional torts, including claims for "intentional mental distress." Mass. Gen. Laws ch. 258, § 10(c). With respect to

intentional tort claims, the preexisting common-law doctrine of governmental immunity, under which "public employers were generally not liable for the torts of their employees," still applies. Spring v. Geriatric Auth. of Holyoke, 475 N.E.2d 727, 734 (Mass. 1985). Consequently, even after the passage of the MTCA, "public employers remain immune from intentional tort claims." Id.

The MTCA broadly defines "public employers" to include "the commonwealth . . . and any department, office, commission, committee, council, board, division, bureau, institution, agency or authority thereof"; however, excluding "the Massachusetts Port Authority, or any other independent body politic and corporate." Mass. Gen. Laws ch. 258, § 1. As the Defendants are the Town of Hull and the individuals in their capacities as Town of Hull School Committee members, they constitute public employers. Therefore, Defendants are exempt from the claim of Intentional Infliction of Emotional Distress and summary judgment as to Count IV is **ALLOWED**.

### 2.   Negligent Infliction of Emotional Distress (Count V)

"A claim for negligent infliction of emotional distress has five elements: '(1) negligence; (2) emotional distress; (3) causation; (4) physical harm; and (5) that a reasonable person would have suffered emotional distress under the circumstances.'" Elliott-Lewis v. Lab'ys, 378 F. Supp. 3d 67, 71 (D. Mass. 2019) (quoting Alicea v. Commonwealth, 993 N.E.2d 725, 730 n.9 (Mass.

2013)). Devine's claim is not viable because he failed to present his claim in writing to the executive officer of the Defendant within two years after the date on which the cause of action arose, as required under Mass. Gen. Laws ch. 258, § 4.

Accordingly, Defendants' motion for summary judgment as to Count V is **ALLOWED**.

### 3.   Interference with Advantageous Economic Relations (Count VIII)

Defendants are immune from any claim arising out of the intentional tort of Interference with Advantageous Economic Relations pursuant to Mass. Gen. Laws ch. 258, § 10(c) and accordingly, Defendants' motion for summary judgment as to Count VIII is **ALLOWED**.

### E.   Violation of Mass. Gen. Laws ch. 151B (Count VII)

Both Title VII and Chapter 151B prohibit employers from discriminating against their employees on the basis of sex or race. 42 U.S.C. § 2000e-2(a)(1); Mass. Gen. Laws ch. 151B, § 4. In disparate-treatment cases, the plaintiff bears the ultimate burden of proving that he was the victim of intentional discrimination. St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 519 (1993). When plaintiffs are unable to offer direct proof of their employers' discriminatory animus -- as is usually the case and was so here -- courts employ the familiar three-step framework set forth in

McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-05 (1973).
See, e.g., Hicks, 509 U.S. at 519.

Under the McDonnell Douglas framework, the plaintiff bears
the initial burden of establishing a prima facie case of
discrimination. McDonnell Douglas, 411 U.S. at 802. A prima facie
case for discrimination based on disparate treatment presents a
four-part test: "(1) the plaintiff must be a member of a protected
class; (2) [he] must be qualified for [his] job; (3) [he] must
suffer an adverse employment action at the hands of [his] employer;
and (4) there must be some evidence of a causal connection between
[his] membership in a protected class and the adverse employment
action." Bhatti v. Trs. of Bos. Univ., 659 F.3d 64, 70 (1st Cir.
2011).

Once the plaintiff establishes a prima facie case, a
presumption arises that the employer unlawfully discriminated
against the plaintiff. Hicks, 509 U.S. at 506. This presumption
"places upon the defendant the burden of producing an explanation
to rebut the prima facie case -- i.e., the burden of 'producing
evidence' that the adverse employment actions were taken 'for a
legitimate, nondiscriminatory reason.'" Id. at 506-07 (quoting
Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 254 (1981)).
Once the employer articulates a legitimate, nondiscriminatory
reason for firing the plaintiff, "to avoid summary judgment, the
plaintiff must introduce sufficient evidence to support two

findings: (1) that the employer's articulated reason for laying off the plaintiff is a pretext, and (2) that the true reason is discriminatory." <u>Udo v. Tomes</u>, 54 F.3d 9, 13 (1st Cir. 1995).

Here, the first three elements of the prima facie case are not disputed: (1) Devine is a member of a protected class based on his sexual orientation, (2) Devine was qualified for his job, and (3) he was terminated, which qualifies as an adverse employment action. The fourth element is the nexus between Devine's sexuality and his termination. Plaintiff has presented some evidence of such a nexus, in particular his public "outing." During the January 29, 2020 School Committee meeting, School Committee Member Lucas Patenaude asked Devine directly if he was gay, effectively outing him to the Committee. <u>See</u> Dkt. 38-2 at 41. When Devine asked if he was being treated differently because he was gay, Patenaude said something to the effect of "as a gay man [myself], [I am] extremely offended" and stated that Devine was giving the gay cause a bad name. Dkt. 38 at 9.

Now the burden shifts to Defendants, who respond that they had legitimate, non-discriminatory reasons for terminating Devine's employment as Superintendent. They cite to the Report which described the emotional toll Devine's conduct had on Hauter, a young man whom Devine knew to be vulnerable and in distress. The Report also revealed that a former student at another high school had a similar experience to that of Hauter, where Devine, who had

26

been a role model to the former student, approached him sexually several years after graduation. The School Committee accepted the Report, and voted to terminate Devine for cause, based on inappropriate conduct, conduct unbecoming his position as Superintendent, and violation of Hull Public School policies and expectations.

Defendants having articulated legitimate, non-discriminatory reasons for the decision to terminate Devine, the burden once again shifts back to Devine to show that Defendants' proffered reason is a pretext for discrimination.

Devine once again points to the fact that the School Committee decided to launch its investigation directly after questioning Devine about his sexuality and Devine confirming that he was gay. Markedly, the notes from that session, written before any interviews took place and subsequent allegations came to light, read: "Mr. Devine demonstrated predatory and grooming behavior." Dkt. 38-15 at 14. That conclusion was reiterated in the Report written several months later, despite the fact that none of the witnesses interviewed stated that they had ever witnessed Devine acting inappropriately with a current student.

Based on these facts, a reasonable juror could find that Devine was terminated because of his sexuality. Accordingly, Defendants' motion for summary judgment as to Count VII is **DENIED**.

**ORDER**

For the foregoing reasons, Defendants' Motion for Summary Judgment (Dkt. 36) is **ALLOWED** as to Counts I, III, IV, V, and VIII and **DENIED** as to Counts II, VI, and VII.

SO ORDERED.

/s/ PATTI B. SARIS
Patti B. Saris
United States District Judge